UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
                                      :
JACKLYN JOYE,                         :            14cv3809 (DLC)
                    Plaintiff,        :
                                      :          OPINION AND ORDER
         -v-                          :
                                      :
PSCH, INC.,                           :
                    Defendant.        :
                                      :
------------------------------------- X

APPEARANCES

For the plaintiff:
Eleanor P. Vale
Law Firm of Eleanor Vale
18th East 48th Street
New York, NY 10017

For the defendant:
Lori Diane Bauer
Damon W. Silver
Jackson Lewis P.C.
666 Third Avenue
29th Floor
New York, NY 10017

DENISE COTE, District Judge:

        This is an employment discrimination action by plaintiff

Jacklyn Joye ("Joye") against her former employer, PSCH, Inc.

("PSCH").  Joye alleges that PSCH -- specifically her former

supervisor Hans Turenne ("Turenne") -- fired her because she is

African American.  Joye has also brought a claim for infliction

of emotional distress.  PSCH has moved for summary judgment on

both claims.  For the reasons that follow, the motion is

granted.

## Background

The following describes the evidence which is either
undisputed or taken in the light most favorable to the
plaintiff, unless otherwise noted.  PSCH is a human services
agency that offers residential services to individuals with
psychiatric and developmental disabilities.  PSCH operates a
residence program called Grand Central Individualized
Residential Alternative ("Grand Central"), located in Queens,
New York.  Joye was hired to work at Grand Central in December
2011.  Joye was hired by Turenne, who is the Residence Manager
of Grand Central, and was Joye's direct supervisor.  Joye's
title was "direct care counselor," and she was responsible for
providing care to six female residents at Grand Central.  She
worked four days per week and her shift lasted from 11:00 p.m.
until 9 a.m.  Joye's responsibilities included preparing the
residents for their daily programs, ironing and setting out the
residents' clothing, preparing breakfast, bathing the residents,
and reporting any medical problems experienced by a resident.

When she began her employment at Grand Central, Joye
received training on PSCH's policies and procedures, including
the policies regarding incident reporting, medical emergency
procedures, and crisis intervention.  As part of her initial
training, Joye was instructed regarding how to respond to a

2

resident who experienced a seizure.  As part of this training, Joye was provided a copy of PSCH's Emergency Medical Treatment policy.  That policy provides that "[i]n the event that a consumer requires emergency medical treatment, the staff will immediately call 911."  Conditions that require emergency medical care include "seizure activity lasting longer than 5 minutes," and "seizure activity where there is no prior history."  For "non-emergent medical conditions" in which a resident experiences a change in physical, mental, or behavioral status, staff members are required to report the condition to a health care professional immediately.

Grand Central also has its own procedures for responding to medical emergencies.  Joye received training on this policy and a copy was also displayed on a wall at Grand Central.  In the event of a medical emergency, staff members are required to call the on-duty nurse, and if no one answers, to call the 24-hour nurse, Ann Mittasch.  In addition to contacting a nurse, staff members are required to notify a member of the residential management staff, according to the following order of precedence: (1) Assistant Manager Christina Michaud, (2) Residence Manager Hans Turenne, (3) Consumer Service Coordinator Jennifer Creary, (4) Assistant Director Claudette Golding, and (5) Deputy Director Nadia Hrvatin.  The staff member is also

3

required to prepare appropriate documentation in order to transport the resident to a hospital, and one staff member must accompany the resident to the hospital. According to the collective bargaining agreement between PSCH and the employees' union, "just cause" exists to fire an employee if the employee "endanger[s] the physical and/or emotional welfare of a consumer of PSCH . . . whether negligent or intentional."

One of the residents who Joye cared for at Grand Central was Jane Doe ("Doe").[1] Doe is diagnosed with "moderate mental retardation" and Down's Syndrome. She had no documented history of seizures prior to March 6, 2013.[2] At approximately 1:30 a.m. on March 6, 2013, Doe experienced a seizure in her room at Grand Central. At that time, Joye was in Doe's room folding clothes. Joye observed Doe experiencing a seizure, and afterwards, saw that Doe had a bloody lip and had urinated herself. Doe's seizure lasted approximately 40-60 seconds. After Doe

---

[1] A pseudonym is used to protect the privacy of the resident.

[2] Although it is undisputed that Doe had no documented history of seizures prior to March 6, 2013, Joye testified at her deposition that she may have heard from another employee, D.H., that Doe had previously experienced a seizure. When D.H. was interviewed during PSCH's investigation of the incident, he stated that he had told Joye that he was unaware of Doe ever experiencing a seizure. Later in her deposition, Joye testified that, as of March 6, 2013, she did not think Doe had ever had a seizure before.

experienced a seizure, her breathing was labored.  Joye checked Doe's medical clipboard to see if Doe had a history of seizures, and none was noted.

Joye attempted to report Doe's seizure by calling the on-duty nurse, C.B., four times.  She made calls at 1:48 a.m., 1:50 a.m., 2:00 a.m., and 2:30 a.m.  C.B. did not answer any of these calls.  Joye did not call 911, the 24-hour nurse, Ann Mittasch, or any member of Grand Central's management, as required by Grand Central emergency procedures.  Joye testified that she did not make any further telephone calls because she did not consider Doe's seizure to be a medical emergency based on her familiarity with seizures.  Joye then continued with her duties.

C.B. returned Joye's phone call at approximately 5:00 a.m., and spoke to Joye concerning Doe's seizure.  C.B. instructed Joye to take Doe's vitals and to call 911 if Doe's condition worsened.  C.B. continued to follow-up on Doe's condition after her conversation with Joye.  C.B. called Grand Central at approximately 6:52 a.m., and instructed D.H. to retake Doe's vital signs.  When D.H. reported that Doe's blood pressure was high, C.B. told D.H. that Doe needed to be taken to the hospital.  At 6:54 a.m., C.B. called Creary, a member of Grand Central management, to discuss Doe's condition.  Finally, at approximately 7:00 a.m., C.B. called Grand Central again and

told Turenne that Doe had to be taken to the hospital.

Turenne, who had arrived at Grand Central shortly before being informed of Doe's seizure by Creary, asked Joye why she had not contacted him immediately after the seizure occurred, as required by Grand Central's procedures.  Joye responded "Why would I call you?  You're not a doctor," or words to that effect.  Turenne told Joye that she had not followed the required procedures for a medical emergency.  Doe was subsequently transported to New York Hospital Queens and remained there for approximately one month.

Following Doe's seizure on March 6, 2013, PSCH's quality assurance department commenced an investigation.  The investigation was conducted by Latchmine Mattow ("Mattow"), who had not met Joye prior to interviewing her in connection with the investigation.  While Mattow conducted the investigation, Joye was suspended from her duties at Grand Central.  During the course of the investigation, Mattow interviewed Joye, Doe, Turenne, D.H., C.B., and direct care counselor Jacqueline Lipscomb.  Mattow prepared an investigative report, which concluded:

> Jacklyn Joye reported that on 3/6/13 at approximately 1:30 am, consumer [Doe] had a seizure while she was sitting on her bed.  She reported that she was not aware of [Doe] having a seizure in the past, nor was there any documented history of

seizures.  [Doe] was also reported to be bleeding a
little bit from her mouth.  Ms. Joye stated that she
attempted to contact the on call nurse at three
separate times without success.  Ms. Joye then
continued with her work responsibilities while [Doe]
was reported to be sleeping with "labored breathing."
Ms. Joye stated that she did not inform her coworker
on the other floor about [Doe's] seizure until he came
down with his group for breakfast.  She did not
attempt to contact the management staff to report the
incident, believing that her attempts to contact the
nurse were sufficient.

   Ms. Joye's failure to seek out assistance from
her coworker or a member of the managerial staff
immediately following [Doe's] alleged seizure
demonstrates poor judgment and a failure to obtain
medical treatment/evaluation for [Doe] in a timely
manner. . . . Based on these findings, the allegation
of neglect was found to be substantial.

The report made the following recommendations: (1) that Joye be
fired, (2) that C.B. receive a supervision letter for failing to
instruct Joye to take Doe to the hospital when she was informed
about the seizure at 5:02 a.m., (3) that all Grand Central staff
be retrained on the medical emergency procedures, and (4) that
Turenne be commended for promptly sending Doe to the hospital
after learning of her seizure.

     PSCH's Deputy Director of Developmental Disability Services
Nadia Hrvatin ("Hrvatin") reviewed the report concerning Doe's
seizure.  Hrvatin is responsible for overseeing operations at
sixteen of PSCH's facilities, including Grand Central.  After
reviewing the report, Hrvatin decided to fire Joye due to "gross
negligence" and because Joye had endangered the physical and/or

7

emotional welfare of a consumer of PSCH.  Joye was fired on

April 16, 2013.  PSCH prepared a disciplinary report in

connection with its decision to fire Joye that stated:

> On 3/6/13 at approximately 2:00am, a consumer
> appeared to have a seizure in her bedroom.  You,
> Jacklyn Joye, witnessed the seizure and after checking
> the consumer's chart you reportedly called the nurse
> covering the residence several times, but did not get
> a return call.  You failed to contact anyone else in
> accordance with the emergency protocol, as you were
> trained to do . . . . You reported that you were not
> aware of the consumer having a seizure in the past,
> nor was there any documented history of seizures
> . . . . you also reported to QA that the consumer was
> bleeding a little bit from her mouth.
>      You did not attempt to contact the management
> staff to report the incident as dictated by the
> emergency protocol, although you were made aware of
> this during your initial orientation and several
> ongoing training sessions.  Due to your actions, the
> consumer was not sent to the ER for further
> evaluations until approximately 7:30am, more than 5
> hours after the seizure occurred.  The consumer was
> taken to New York Hospital Queens Emergency Room and
> was later admitted for a subdural hematoma and blood
> in her urine.  Although you recognized that [Doe] was
> in a medical crisis, you failed to reach out to your
> co-worker who was on the second floor and you did not
> follow the emergency protocol, which includes
> contacting your management team during an emergency.
> As a result of your actions, your employment with PSCH
> Inc. is being terminated immediately.

At the time Hrvatin made the determination to fire Joye,

Hrvatin was unaware that Joye is African-American.  Hrvatin did

not learn of Joye's race until the commencement of this

litigation.  Hrvatin did not receive any input from Turenne in

connection with Hrvatin's decision to fire Joye.[3]  After being fired, Joye filed a grievance with her labor union, New England Joint Board Unite Here Local 1904.  After holding a hearing, the union denied Joye's grievance.

Joye alleges that PSCH discriminated against her because she was disciplined more harshly than personnel of Caribbean origin for similar infractions.  According to Joye, her manager Turenne, who is of Caribbean origin, treated employees of Caribbean origin more favorably than he treated African American employees.  Joye does not contend that anyone in PSCH's management ever remarked on her race.  Joye identifies several instances in which she was treated differently than other employees.  The following is a description of Joye's disciplinary history, as well as those who she believes were treated more favorably.  With one exception, none of the comparators Joye has identified was ever accused of failing to follow the PSCH procedures in response to a resident's medical emergency.

---

[3] Joye does not contend that Turenne had any involvement in the decision to fire her, but she testified at her deposition that Turenne may have been involved in the decision to suspend her during the pendency of the investigation.  When asked what facts supported this belief, Joye admitted that she was not aware of any facts indicating that Turenne was involved in the decisions to suspend or fire her.

## A. Joye's Disciplinary History

Prior to the incident of March 6, 2013, Joye had been disciplined on at least two occasions.  On July 18, 2012, Joye was issued a supervision letter because she had been late to work seven times during a period of approximately six weeks.  On February 11, 2013, Joye received a second supervision letter because she had failed to record properly a resident's bowel movements as required by PSCH's guidelines.  In both instances, Joye was directed to improve her performance.

## B. Y.B.

According to Joye, Turenne treated Y.B., who is possibly of Caribbean origin,[4] more favorably than he treated Joye.  Y.B. and Joye were both responsible for cleaning a refrigerator at Grand Central.  Joye states that, during a four month period, Turenne checked to see if Joye had cleaned the refrigerator every Wednesday, but never checked on whether Y.B. had cleaned the refrigerator.  Joye does not explain the basis of her belief that Turenne never checked to see if Y.B. had cleaned the refrigerator except to state that "[Y.B.] would have told me." Joye admitted that it was possible that Turenne had reviewed or

---

[4] Joye testified that she believed Y.B. was from "one of those foreign countries," possibly Jamaica, Cuba, or Trinidad & Tobago.

10

criticized Y.B.'s work when Joye was not present because she had
no personal knowledge concerning Turenne's supervision of Y.B.
Joye was never disciplined for failing to clean the
refrigerator.  This is the only instances that Joye could
identify in which Turenne treated Y.B. differently than her.

### C. D.G.

According to Joye, D.G. is of Caribbean origin, and also
worked at Grand Central.  Joye contends that Turenne did not
discipline D.G. as harshly as he disciplined Joye.  On three
instances, D.G. was disciplined in writing by PSCH.  On August
28, 2012, D.G. received a supervision letter from Pascal
Fontaine -- a PSCH manager -- because she had been caught
sleeping during working hours.  On September 18, 2012, D.G.
received a supervision letter from Turenne because D.G. had
failed to record properly a resident's bowel movements, as
required by PSCH's guidelines.  On February 15, 2013, D.G.
received a supervision letter from Turenne because D.G. had
abused her sick time by calling in sick excessively.  Joye also
described an instance in which she witnessed D.G. entertaining
her cousin at Grand Central during working hours, contrary to
PSCH policies.  Joye did not report this to Turenne but did
notify another supervisor.  Joye also states that, on several
occasions, D.G. was disrespectful to her, including one instance

11

in which Turenne was present.  Joye contends that she was discriminated against by Turenne because D.G. was not fired for these infractions while Joye was fired because of the incident of March 6, 2013.

**D. D.H.**

D.H., another employee of PSCH, was present at Grand Central when Doe experienced a seizure on March 6, 2013.  At the time of Doe's seizure, D.H. was working on a different floor. Joye did not notify D.H. that Doe had experienced a seizure.  At the direction of C.B., D.H. took Doe's vitals shortly before Turenne arrived at Grand Central around 7:00 a.m.

D.H. is African American.  Although D.H., like Joye, is African American, Joye contends that Turenne treated D.H. more favorably than he treated Joye.  Specifically, Joye states that Turenne was aware that D.H. slept on the job and showed up to work intoxicated, but did not punish him.

**E. C.B.**

C.B. was the on-call nurse the night Doe experienced a seizure.  Following the investigation by Mattow, C.B. was given a supervision letter for "failing to provide Ms. Joye with a clear directive to send [Doe] to the ER at 5:02am after being informed that [Doe] had a seizure of unknown origin."  The decision to discipline C.B. was made by PSCH's Program Director

12

of Nursing based on the recommendation of Mattow.  Joye does not
contend that Turenne was involved in the decision as to how to
discipline C.B.

Joye contends that C.B. was treated favorably because C.B.
was only given a supervision letter, whereas Joye was fired,
even though they both failed to have Doe sent to the emergency
room immediately.  Joye believes C.B. is of Caribbean origin
based on her accent when Joye spoke to her on the telephone on
March 6, 2013.

## I.   Procedural History

This case was filed on May 29, 2014.  PSCH filed the
instant motion for summary judgment on April 15, 2016.  The
motion became fully submitted on July 20.  On November 1, the
case was reassigned to this Court.

## Discussion

Summary judgment may not be granted unless all of the
submissions taken together "show[] that there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary
judgment is appropriate where the record taken as a whole could
not lead a rational trier of fact to find for the non-moving
party."  Smith v. Cty. of Suffolk, 776 F.3d 114, 121 (2d Cir.

2015) (citation omitted).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 456 (1992); Gemmink v. Jay Peak Inc., 807 F.3d. 46, 48 (2d Cir. 2015).  "[W]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented."  Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004) (citation omitted).

Once the moving party has asserted facts showing that the non-movant's claims or affirmative defenses cannot be sustained, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial."  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted); see Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).  "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "mere speculation or

14

conjecture as to the true nature of the facts." <u>Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

## I.  Employment Discrimination Claim

Claims under Title VII are governed, at the summary judgment stage, by the burden-shifting analysis first established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973). <u>Tolbert v. Smith</u>, 790 F.3d 427, 434 (2d Cir. 2015). Under that framework, a plaintiff bears the burden of establishing a <u>prima facie</u> case of discrimination by showing (1) she belongs to a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. <u>Id.</u> at 435. Once an employee shows a <u>prima facie</u> case of discrimination, "the burden shifts to the employer to give a legitimate, non-discriminatory reason for its actions." <u>Kirkland v. Cablevision Sys.</u>, 760 F.3d 223, 225 (2d Cir. 2014). "If the employer does so, the burden then shifts back to the plaintiff to show that the employer's explanation is a pretext

15

for race discrimination or retaliation."  <u>Id.</u>

The parties do not dispute that Joye is a member of a protected class, that she was qualified for the position of direct care counselor, or that her firing constitutes an adverse employment action.[5]  The only element of the <u>prima facie</u> case in dispute is whether Joye has established that her firing occurred under circumstances giving rise to an inference of discriminatory intent.

A plaintiff may raise an inference of discriminatory intent by showing that the employer subjected her to disparate treatment, that is, treated her less favorably than a similarly situated employee outside her protected group -- i.e., a "comparator."  <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 39 (2d Cir. 2000).  A plaintiff relying on a comparator to show

---

[5] In its motion, PSCH construes Joye's claim as one seeking redress for the termination of her employment.  But, PSCH also argues that increased supervision does not constitute an adverse employment action.  "A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment."  <u>Galabya v. N.Y. City Bd. of Educ.</u>, 202 F.3d 636, 640 (2d Cir. 2000).  Examples of adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities."  <u>Id.</u> (citation omitted).  In her opposition brief, Joye does not contend that any increased supervision she may have experienced constitutes an adverse employment action.  As a consequence, her claim is construed as seeking relief solely for the termination of her employment.

16

disparate treatment must show that the comparator is "similarly situated in all material respects" to the plaintiff.  Id. (citation omitted).  A comparator is similarly situated when there is an "objectively identifiable basis for comparability," meaning that the comparator and the plaintiff were subject to the same workplace standards and engaged in misconduct of "comparable seriousness," but received different punishments. Id. at 40 (citation omitted).

Joye has failed to show a prima facie case of discrimination under Title VII because she has not shown that she was fired under circumstances giving rise to an inference of discriminatory intent.  Because it is undisputed that Turenne never made comments to Joye about her race, Joye relies exclusively on comparators to support her claim that she experienced disparate treatment from Turenne.[6]  None of the comparators identified by Joye, however, is "similarly situated in all material respects."  Id. at 39 (citation omitted). Indeed, the only comparator who requires a close analysis is

---

[6] Joye alleges only that Turenne, and not any other member of PSCH's management, discriminated against her.  Because Joye fails to present evidence of disparate treatment by Turenne, it is unnecessary to address the implications of her failure to show that Turenne had any role in PSCH's decision to terminate Joye's employment.

C.B.  But, even with respect to her, Joye has not presented evidence sufficient to raise a genuine issue of disputed fact that PSCH discriminated against her.

First, with respect to Y.B. and D.G., there is no evidence that either committed misconduct of comparable seriousness to Joye's failure to properly respond to Doe's seizure.  The only misconduct identified on the part of Y.B. is that she failed to clean a refrigerator at Grand Central.  The misconduct identified on the part of D.G. is that she abused her sick time, failed to record a resident's bowel movements,[7] was disrespectful to her coworkers, and entertained her cousin during work.  None of these infractions by Y.B. and D.G. involves a failure to obtain necessary medical care for a resident during a medical emergency.  Indeed, Joye testified that she did not know of any instance in which a direct care counselor failed to follow the procedures for a medical emergency and was not fired.

Second, D.H. is not a proper comparator because he, like Joye, is African American.  A comparator cannot be a member of the same protected group as the plaintiff.  Id.  D.H. is also not a proper comparator because Joye has not shown that D.H. is

---

[7] Notably, both Joye and D.G. received identical punishment, a supervision letter, for failing to record a resident's bowel movements.

similarly situated in all material respects.  There is no
evidence that D.H. failed to follow PSCH's policies for medical
emergencies.  Although D.H. was present at Grand Central at the
time Doe experienced a seizure, he was working on a different
floor, and was not made aware of the medical emergency until
shortly before Doe was sent by the hospital at the direction of
Turenne.

Finally, C.B. is not a proper comparator for several
reasons.  First, the only evidence that C.B. belongs to a
different racial group than Joye is that Joye believed C.B. to
be Caribbean based on C.B.'s accent during a telephone
conversation.  Joye has never met C.B. in person.  Joye's
speculation as to C.B.'s race is insufficient.  See Harlen
Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir.
2001) (At summary judgment stage, "mere speculation and
conjecture is insufficient to preclude the granting of the
motion.").  Second, Joye has not introduced evidence showing
that C.B.'s misconduct is of comparable seriousness to her own.
After C.B.'s initial conversation with Joye, C.B. instructed
Joye to take Doe's vitals and to continue to monitor Doe's
condition.  C.B. also followed up on Doe's condition by making
telephone calls to D.H., Creary, and Turenne.  In each of those
telephone calls, C.B. stated that Doe had to be taken to the

19

hospital.  No reasonable juror could find that C.B.'s misconduct is of comparable seriousness to that of Joye, who continued with her normal duties and allowed several hours to pass before she informed anyone of Doe's medical emergency.  Joye has also introduced no evidence showing that C.B. is "subject to the same workplace standards" as Joye.  Graham, 230 F.3d at 40.  C.B. is employed by PSCH as a nurse, not a direct care counselor, and is subject to a different chain of command at PSCH than Joye.  In addition, C.B. is not assigned to Grand Central, and there is no evidence that she is subject to the specific procedures implemented by Grand Central, such as the requirement to call a member of Grand Central's management in the case of a medical emergency.

Accordingly, Joye has failed to show a prima facie case for race discrimination under Title VII because she has not shown disparate treatment of a comparator who is similarly situated in all material respects.  Even if it is assumed that Joye had met her minimal burden of showing a prima facie case of discrimination, PSCH has carried its burden of showing that it fired Joye for a reason unrelated to her race.  The plaintiff has failed to produce evidence from which a reasonable juror could infer that PSCH's reason for firing Joye was a pretext for discrimination.  Summary judgment shall be granted in favor of

20

PSCH on the Title VII claim.

## II.   Infliction of Emotional Distress

Joye has brought a claim for infliction of emotional distress.  Joye alleges that she has suffered emotional distress as a result of being fired by PSCH.  Specifically, Joye claims that she has experienced extreme anxiety and headaches because she is concerned that she may not be able to find new employment.  Joye has not specified whether her claim is for intentional infliction of emotional distress or negligent infliction of emotional distress.  Under either theory, this claim is barred under New York Law.[8]

Claims for intentional infliction of emotional distress are subject to a one year statute of limitations, starting on the date of the injury.  Bellissimo v. Mitchell, 995 N.Y.S.2d 603, 605 (2d Dep't 2014).  Joye was fired by PSCH on April 16, 2013, and did not commence this action until May 29, 2014, over one year later.

Claims for negligent infliction of emotional distress against one's employer are preempted by New York's Workers'

---

[8] This claim is analyzed under New York law because all the relevant conduct occurred in New York, the parties reside in New York, and PSCH relies exclusively on New York law in its briefs. Joye does not respond to PSCH's arguments concerning this claim in her opposition brief.

Compensation Law.  <u>See</u> <u>Kruger v. EMFT, LLC</u>, 930 N.Y.S.2d 11, 13 (2d Dep't 2011) (affirming dismissal of negligent infliction of emotional distress as barred by the Workers' Compensation Law). Accordingly, Joye's claim for infliction of emotional distress is dismissed.

### Conclusion

PSCH's April 15, 2016 motion for summary judgment is granted.  The Clerk of Court shall enter judgment for the defendant and close the case.


Dated:    New York, New York
          November 28, 2016

                              _____
                              DENISE COTE
                    United States District Judge